FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2024 APR -1 PM 3:08

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        vs.<br><br>MOODY MOTOR CO., INC.,<br><br>                Defendant. | 8:24CR**43**<br><br>PLEA AGREEMENT |

IT IS HEREBY AGREED between the plaintiff, United States of America, through its counsel, Susan T. Lehr, United States Attorney and Sean P. Lynch, Assistant United States Attorney, and defendant, Moody Motor Co., Inc., and Michael J. Tasset, counsel for defendant, as follows:

I

**THE PLEA**

A.      CHARGE(S) & FORFEITURE ALLEGATION(S).

Defendant agrees to waive Indictment and plead guilty to an Information. Count I charges a violation of Title 18, United States Code, Section 3.

B.      In exchange for the defendant's plea of guilty as indicated above, the United States agrees as follows:

1.      The United States agrees that the defendant and its employees will not be federally prosecuted in the District of Nebraska for Clean Air Act crimes as disclosed by the discovery material delivered to the defendant's attorney as of the date this agreement is signed by all parties, other than as set forth in paragraph A, above. This agreement not to prosecute the defendant for specific crimes does not prevent any prosecuting authority from prosecuting the defendant for any other crime, or for any crime involving physical injury or death.

II

**NATURE OF THE OFFENSE**

A.      ELEMENTS EXPLAINED.

Defendant understands that the offense to which defendant is pleading guilty has the following elements:

1

1. Diesel Performance of Texas and certain Moody Motor Co., Inc. employees had committed the crime of Clean Air Act Violation;

2. Defendant knew that Diesel Performance of Texas and certain Moody Motor Co., Inc. employees had committed the crime of a Clean Air Act Violation;

3. Defendant assisted Diesel Performance of Texas and certain Moody Motor Co., Inc. employees in some way; *by purchasing code, providing physical space for installation of the code, & performing*

4. The defendant did so with the intent to prevent Diesel Performance of Texas and certain Moody Motor Co., Inc. employees from being arrested, prosecuted, and punished. *physical modifications to the vehicles' exhaust system to allow the code to operate.*

*4/1/24 MM*
*4/1/24 MJT*
*4/1/24 SL*

## B. ELEMENTS UNDERSTOOD AND ADMITTED - FACTUAL BASIS.

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crime and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed:

The purpose of the Clean Air Act is, among other things, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1); see also 42 U.S.C. § 7470. In enacting the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2).

The CAA regulates "mobile sources," which include motor vehicle engines and off-road vehicles and engines. Mobile sources must comply with the CAA emission standards. Those standards apply to cars, trucks, buses, recreational vehicles and engines, generators, farm and construction machines, lawn and garden equipment, marine engines, and locomotives.

Congress has instructed the EPA to establish regulations and standards to control emissions from motor vehicles which cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. § 7521(a)(1).

Congress authorized EPA to enforce the emission standards and regulations applicable to mobile sources to ensure that pollutant levels are controlled and reduced. 42 U.S.C. § 7524.

Pursuant to 42 U.S.C. §§ 7521-7554, and the regulations promulgated thereunder, the EPA has established standards limiting the emission of air pollutants from various classes of motor vehicle engines.

Heavy-duty diesel engines (HDDEs) are one such category, and are subject to the regulations found at 40 C.F.R. Part 86, Subpart A. Light-duty vehicles and medium-duty vehicles are subject to the regulations found at 40 C.F.R. Part 86, Subpart S. As required by the CAA, the

emission standards must "reflect the greatest degree of emission reduction achievable through the application of [available] technology." 42 U.S.C. § 7521(a)(3)(A)(i). Accordingly, the EPA has established emission standards for vehicles. 40 C.F.R. §§ 86.004-11, 86.007-11, 86.096-11, 86.098-11, 86.009-11 (HDDE); 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10, 86.1811-17 (light-duty/medium-duty vehicles).

To meet these emission standards, engine manufacturers employ many devices and "elements of design." "Elements of design" means "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations, and/or the results of systems interaction, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. § 86.094-2. Manufacturers also employ certain hardware devices as emission control systems to manage and treat engine exhaust to reduce the levels of pollutants that are being emitted into the air. Such devices include diesel particulate filters (DPF), exhaust gas recirculation (EGR), diesel oxidation catalyst (DOC), and selective catalytic reduction (SCR).

Under 42 U.S.C. § 7521(m)(1), the EPA is authorized to create regulations requiring manufacturers to install on-board diagnostic (OBD) systems on vehicles and engines to ensure the vehicles' emission control systems are functioning properly. The EPA has thus enacted regulations that require manufacturers to install OBD systems on both light-duty and heavy-duty vehicles and engines. OBD systems must be "capable of monitoring all emission-related engine systems or components," including the DPF, EGR, DOC, and SCR. See 40 C.F.R. §§ 86.010-18 and 86.1806-05.

The CAA provides criminal penalties for tampering with monitoring devices or methods. Pursuant to 42 U.S.C. § 7413(c)(2)(C), any person who knowingly falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under the CAA shall, upon conviction, be subject to a fine and up to two years of imprisonment.

OBD systems are monitoring devices or methods required to be maintained or followed under the CAA to ensure that the emission control systems are functioning properly. See 40 C.F.R. §§ 86.010-18(a) (requiring OBD system for certain heavy-duty vehicles "capable of monitoring all emission-related engine systems or components during the life of the engine") and § 86.1806-5(a)(1) (requiring OBD system for certain light-duty vehicles "capable of monitoring all emission-related powertrain systems or components during the applicable useful life of the vehicle"). Accordingly, tampering with or rending inaccurate an OBD system is a criminal violation of the CAA

Also applicable is 18 U.S.C. § 371, which states that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons does any act to affect the object of the conspiracy, each shall be subject to a fine and/or up to five years of imprisonment.

3

*DIESEL EMISSION/EXHAUST SYSTEM COMPONENTS*

Diesel-powered trucks have additional emission system components compared to gasoline-powered trucks. Several of the components, described below, are affixed to the undercarriage of diesel trucks. These components work in concert and are intended to reduce the pollutant emissions produced by diesel-powered engines. Since model year 2008, all diesel trucks have been required to be equipped with an OBD, which monitors all emission-related engine systems and components, including the DOC, DPF, EGR and SCR. If there is a malfunction or deterioration of the emission system, the OBD will cause a Malfunction Indicator/Check Engine Light to be illuminated in the truck's cabin. The diagram below shows the general layout of some of these components:



In certain circumstances, if a hardware emission system problem is not resolved, the OBD can shut down the truck or limit the top speed of the truck, an effect commonly referred to as "limp mode" or "power reduced mode." In some instances, operating in limp mode will limit a truck's horsepower (potentially resulting in a maximum speed as low as five miles per hour). This is intended to provide an incentive for the truck's operator to repair the truck. Effectively, the hardware components (DOC, DPF, EGR and SCR) and computer component (OBD) work together to reduce emissions and monitor diesel truck emission hardware components.

A DOC is one component of the hardware emission system. The DOC converts hydrocarbons (fuel) and carbon monoxide (exhaust) into water and carbon dioxide through an oxidation reaction. The DOC is akin to a gasoline engine's catalytic converter. The function of both a DOC and a catalytic converter is to reduce pollutants released into the atmosphere.

A second component is the SCR system. The SCR is a type of catalytic converter that uses Diesel Exhaust Fluid, which contains a urea-based fluid that is injected into the exhaust gases. When the urea and NOx (nitrogen oxides) containing gases reach the SCR catalyst, they react to form nitrogen and water.

A DPF is a third component. Once the exhaust stream has been treated by the DOC and SCR, it travels through the DPF where particulate matter is trapped and stored, further reducing the pollutants released into the atmosphere.

A fourth component is the EGR system. This system provides a nitrogen oxide (NOx) emission reduction technique by recirculating a portion of the engine's exhaust gas back to the engine cylinders. This process dilutes the oxygen in the incoming air stream and provides gases inert to combustion to act as absorbents of combustion heat to reduce peak in-cylinder temperatures. This reduces combustion temperatures and thereby reduces formation of NOx.

*DEFEAT DEVICES AND METHODS*

There are various methods to defeat the emission system on a vehicle. One method used to defeat the emission system is to completely remove the portion of the exhaust system that contains the emission control devices and replace it with a section of exhaust tubing or an aftermarket "straight pipe." Under this method the emission components are no longer installed to limit pollutant gases and particulate matter from being emitted to the atmosphere.

Another method used to defeat the required emission system on a vehicle is to remove components such as the DOC and DPF, hollow them out by removing internal contents, and then reconnect them to the exhaust pipe. This gives the appearance they are still intact but eliminates their effective function.

Another method used to defeat the emission system is to disconnect or remove the SCR. The SCR consumes diesel exhaust fluid at a rate of 1% to 2% of fuel consumption. As diesel exhaust fluid is priced similarly to diesel fuel, disabling the SCR avoids the expense of refilling the diesel exhaust fluid.

Yet another method used to defeat the emission system is to disable the EGR. The EGR can be turned off electronically or can be physically removed. Examples of EGR delete hardware include EGR block plates, which are used to cover the ports on the exhaust manifold or other exhaust or intake components where the EGR would otherwise be used to redirect exhaust gas back to the intake; a replacement manifold that would not include an EGR port; and EGR cooler replacements that are welded shut. Disabling the EGR can increase engine power but at the expense of greater formation of NOx.

If any of the emissions hardware components (DOC, DPF, SCR, or EGR) are removed or disabled as described above, a properly functioning OBD will detect a malfunction. Thus, a defeat device must be used to manipulate the OBD to prevent the truck from going into "limp mode" and to prevent the Malfunction Indicator Light from turning on. The practice of using a defeat device to manipulate an OBD system in this manner is commonly referred to as "tuning" the vehicle.

Although it is possible for an individual to legitimately "tune" in a manner that does not impair emission controls or the OBD, using other methods, this summary focuses on those circumstances where tuning manipulates a vehicle's OBD system in such a way as to prevent the

OBD from detecting the removal or disabling of the emission hardware components. When a vehicle is "tuned" in this way, it may be able to run with increased horsepower and torque, and a vehicle's fuel mileage may also increase. However, tuning vehicles in this manner results in significantly increased pollutant emissions. The process of tuning uses a software program often referred to as a "tune," where a tune is a software program used by a tuner to affect engine operations, often including emissions controls and monitoring devices.

The EPA is aware of multiple types of defeat devices used for tuning. One example is a plug-in tuner, which is a defeat device that can be plugged into the vehicle's data link connector to the OBD and permit "on-the-fly" tuning. Plug-in tuners allow the driver to turn on and off at will the software modifications that manipulate the engine computer module and prevent the OBD from detecting a malfunction in the emission controls.

Another example is a defeat device that involves "flashing" (reprogramming) the engine computer module. This defeat device prevents the OBD from detecting a malfunction in the emission controls. In preventing the OBD from detecting these malfunctions, these defeat devices are tampering with or rendering inaccurate a monitoring device or method required under the CAA.

## *MOODY MOTOR COMPANY, INCORPORATED*

Moody Motor Co., Inc. (hereinafter "Moody Motors") is a certified Ford dealership located in Niobrara. In addition to selling new and used vehicles, Moody Motors has a vehicle service department. Moody Motors has been in operation since 1955. Matthew Moody is the registered Director, President, and Treasurer of Moody Motor Company. Moody Motor Company has approximately 18 employees.

In January 2022, EPA-CID received information stemming from an investigation in Dallas, Texas involving Phillip Waddell. Waddell owned and operated Diesel Performance of Texas (hereinafter DPTX). Waddell sold tuners and delete kits which are products used to modify exhaust systems. Waddell had supplied Moody Motors with these products. DPTX sold Moody Motors these products approximately 14 times between April 2019 and January 31, 2022. [handwritten: Moody Motors assisted DPTX by purchasing code from DPTX, providing physical space for the installation of DPTX's code on the affected vehicles, and performed physical modifications to the vehicles' exhaust systems to allow the code to operate as intended.]

On April 28, 2022, EPA-CID executed a search warrant at Moody Motors and interviewed multiple employees and Matthew Moody. The employees admitted to performing aftermarket delete and tune work. One of the mechanics estimated that they had installed delete devices on approximately 10-20 vehicles. The mechanic confirmed that the tunes used were purchased from DPTX. Matthew Moody was interviewed and admitted that Moody Motors had been performing deletes. Matthew Moody stated one of the trucks they had performed a delete on was for his father. He stated that he did this because the truck was a trade in that needed a lot of work done on it to include having sensors out and that this was easier than replacing the sensors. They did install a straight pipe and an EGR block on the truck. Matthew Moody then contacted his father who brought the truck in to be inspected by EPA-CID who confirmed that the emissions control system had been illegally modified and the invoice reflected that the delete tune had been purchased from DPTX.

6

## III
## PENALTIES

A. COUNT I. Defendant understands that the crime to which defendant is pleading guilty carries the following penalties:

1. Not more than 5 years' probation;
2. A maximum fine of $ 250,000[1];
3. A mandatory special assessment of $125 per count; and
4. Possible ineligibility for certain Federal benefits.

## IV
## AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE DISTRICT OF NEBRASKA

This plea agreement is limited to the United States Attorney's Office for the District of Nebraska, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities.

## V
## *SENTENCING ISSUES*

A. SENTENCING AGREEMENTS.

Although the parties understand that the Guidelines are advisory and only one of the factors the court will consider under 18 U.S.C. § 3553(a) in imposing a sentence, the parties will jointly recommend the following Base Offense Level, Specific Offense Characteristics, Adjustments and Departures (if applicable). Unless otherwise stated, all agreements as to sentencing issues are made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B).

1. If the defendant is found to be entitled to an offense level reduction under U.S.S.G. 3E1.1(a) for acceptance of responsibility, the United States hereby moves that the court reduce the defendant's offense level by one additional level, pursuant to U.S.S.G. § 3E1.1(b), if that paragraph otherwise applies.

---

[1] Pursuant to 18 USC § 3, the maximum possible punishment is "not more than one-half the maximum fine prescribed for punishment of the principal." The maximum possible punishment for a violation of 42 U.S.C. § 7413(c)(2)(C) is 2 years and/or a fine of $500,000 under Title 18. As a result, the maximum possible imprisonment as an accessory after the fact for an individual to said offense is 1 year making this a Class A Misdemeanor, but pursuant to 18 U.S.C. § 3, half the fine amount is $ 250,000.

B.   ACCEPTANCE OF RESPONSIBILITY.

Notwithstanding paragraph A above, the United States will <u>not</u> recommend any adjustment for Acceptance of Responsibility if defendant:

1. Fails to admit a complete factual basis for the guilty plea at the time it is entered, or
2. Denies involvement in the offense, gives conflicting statements about that involvement, or is untruthful with the court or probation officer, or
3. Fails to appear in court, or
4. Engages in additional criminal conduct, or
5. Attempts to withdraw the guilty plea, or
6. Refuses to abide by any lawful court order, or
7. Contests or assists any third party in contesting the forfeiture of property(ies)seized or forfeited in connection with this case.

**The parties further agree the defendant will make no "blanket" objections to the criminal history calculation (specific objections based on stated grounds are permitted). Objections to criminal history on the basis that the defendant was not the person who was convicted of the offense(s) described in the presentence investigation report or on the basis that the defendant was not represented by counsel in connection with such conviction(s), if determined to be unfounded, are evidence the defendant has not accepted responsibility and the parties agree no credit for acceptance of responsibility should be given.**

C.   ADJUSTMENTS, DEPARTURES & REDUCTIONS UNDER 18 U.S.C. § 3553.

The parties agree that defendant may request or recommend additional downward adjustments, departures, including criminal history departures under U.S.S.G. § 4A1.3, and sentence reductions under 18 U.S.C. § 3553(a), and that the United States will oppose any such downward adjustments, departures, and sentence reductions not set forth in Section V, paragraph A above.

D.   "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION.

The parties agree that the facts in the "factual basis" paragraph of this agreement, if any, are true, and may be considered as "relevant conduct" under U.S.S.G. § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

The parties agree that all information known by the office of United States Pretrial Service may be used by the Probation Office in submitting its presentence report, and may be disclosed to the court for purposes of sentencing.

## VI

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

The defendant hereby knowingly and expressly waives any and all rights to appeal the defendant's conviction and sentence, including any restitution order in this case, and including a waiver of all motions, defenses, and objections which the defendant could assert to the charges or to the Court's entry of Judgment against the defendant, and including review pursuant to 18 U.S.C. § 3742 of any sentence imposed, except:

    (a) As provided in Section I above, (if this is a conditional guilty plea); and

    (b) A claim of ineffective assistance of counsel.

    (c) A right to file a motion under Section 3582(c)(1)(A);

        1. the general right to file a compassionate release motion;

        2. the right to file a second or successive such motion; or

        3. the right to appeal the denial of a compassionate release.

The defendant further knowingly and expressly waives any and all rights to contest the defendant's conviction and sentence in any post-conviction proceedings, including any proceedings under 28 U.S.C. § 2255, except:

    (a) The right to timely challenge the defendant's conviction and the sentence of the Court should the Eighth Circuit Court of Appeals or the United States Supreme Court later find that the charge to which the defendant is agreeing to plead guilty fails to state a crime.

    (b) The right to seek post-conviction relief based on ineffective assistance of counsel.

If defendant breaches this plea agreement, at any time, in any way, including, but not limited to, appealing or collaterally attacking the conviction or sentence, the United States may prosecute defendant for any counts, including those with mandatory minimum sentences, dismissed or not charged pursuant to this plea agreement. Additionally, the United States may use any factual admissions made by defendant pursuant to this plea agreement in any such prosecution.

## VII

## BREACH OF AGREEMENT

Should it be concluded by the United States that the defendant has committed a crime subsequent to signing the plea agreement, or otherwise violated this plea agreement, the

defendant shall then be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted. Any such prosecution(s) may be premised upon any information, statement, or testimony provided by the defendant.

In the event the defendant commits a crime or otherwise violates any term or condition of this plea agreement, the defendant shall not, because of such violation of this agreement, be allowed to withdraw the defendant's plea of guilty, and the United States will be relieved of any obligation it otherwise has under this agreement and may withdraw any motions for dismissal of charges or for sentence relief it had already filed.

## VIII
## SCOPE OF AGREEMENT

A. This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral.

B. By signing this agreement, the defendant agrees that the time between the date the defendant signs the agreement and the date of the guilty plea will be excluded under the Speedy Trial Act. The defendant stipulates that such period of delay is necessary in order for the defendant to have opportunity to enter the anticipated plea of guilty, and that the ends of justice served by such period of delay outweigh the best interest of the defendant and the public in a speedy trial.

C. The United States may use against the defendant any disclosure(s) the defendant has made pursuant to this agreement in any civil proceeding. Nothing contained in this agreement shall in any manner limit the defendant's civil liability which may otherwise be found to exist, or in any manner limit or prevent the United States from pursuing any applicable civil remedy, including but not limited to remedies regarding asset forfeiture and/or taxation.

D. Pursuant to 18 U.S.C. § 3013, the defendant will pay to the Clerk of the District Court the mandatory special assessment of $125 for each misdemeanor count to which the defendant pleads guilty. The defendant will make this payment at or before the time of sentencing.

E. By signing this agreement, the defendant waives the right to withdraw the defendant's plea of guilty pursuant to Federal Rule of Criminal Procedure 11(d). The defendant may only withdraw the guilty plea in the event the court rejects the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(5). Furthermore, defendant understands that if the court rejects the plea agreement, whether or not defendant withdraws the guilty plea, the United States

is relieved of any obligation it had under the agreement and defendant shall be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted.

F. This agreement may be withdrawn by the United States at any time prior to its being signed by all parties.

## IX

## MODIFICATION OF AGREEMENT MUST BE IN WRITING

No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

## X

## DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT

By signing this agreement, defendant certifies that defendant read it (or that it has been read to defendant in defendant's native language). Defendant has discussed the terms of this agreement with defense counsel and fully understands its meaning and effect.

UNITED STATES OF AMERICA
SUSAN T. LEHR
United States Attorney

4/1/24
Date

SEAN P. LYNCH
ASSISTANT U.S. ATTORNEY

2-4-24
Date

MATTHEW W. MOODY, President on behalf of
MOODY MOTOR CO., INC.
DEFENDANT

2/07/24
Date

MICHAEL J. TASSET
COUNSEL FOR DEFENDANT

11